v. SemaConnect, Inc. Section 101 of the Patent Act expressly permits the patenting of any new improvement of any machine. ChargePoint's claims fall squarely within that provision. For example, the plain components such as a transceiver, a data control unit, a controller that can receive communications as part of a demand response system and modify the application of charge transfer based on those communications. This is not the stuff of abstract ideas. It's not math, mental processes, or fundamental economic practices. It's a new charging station improved by combining specific components that enable communication with utilities about whether to ratchet down or even reverse the flow of power to an electric vehicle. So it's about sending and receiving communications over a server? It has the capability of doing that, Your Honor, but I think the error of the district court was to say it was solely about that and to read the structural limitations out of the claims. If you look, for example, at SemaConnect's Non-Infringement Defendants, and I encourage the court to turn to them, they're found on pages 956 to 960 of the appendix, you'll see SemaConnect explaining in great detail why the components of its machines do not embody each of the 131 patent and the other patents technical limitations, the ones I just quoted, as well as the other claims. For example, quote... So what does that prove? Well, obviously there's a factual dispute about infringement, but these are not arguments that SemaConnect doesn't do the abstract concept of sending commands over a network. They're very nitty-gritty factual responses, and they confirm that the claims claim specifically a configuration of components, specific components and some non-generic components, in a particular way to accomplish the end of making, giving this electric vehicle charging station intelligence that it didn't have, and doing things like demand response and communicating with utilities. But if all of, suppose there were three different ways to, all of them, routine, conventional, and you chose one of those routine, conventional ways, then they could easily choose the other and be non-infringing, but that fact that they were not meeting some of the claim elements wouldn't tell you that what's being claimed is on the right side of the line for eligibility. Well, I think this court's cases draw a distinction between taking generic devices or components and using them for an abstract end, claiming the use of the generic components for an abstract end, and on the one hand, and claiming a new configuration of components on the other. If you look, for example, at the smart systems case that SemaConnect cites, look what the court says there. The asserted claims are not directed to a new type of bank card, churn style or database, nor do the claims provide a method for processing data that improves existing technological processes. Rather, the claims are directed to the collection of storage and recognition of data. Second statement, the claims are not directed to a combined order of specific rules that improve any technological processes, but rather invoke computers in the collection and arrangement of data. Third statement, they don't argue that its claims are directed to an improvement in computer technology. So this case involves what's on the other side of that line, a very concrete type of device that's improved. And I do think that the non-improvement... What's improved? The charging station? Correct, Your Honor. There are four patents at issue. Two of them claim improved charging stations. But at the end of the day, all the charging station is doing is turning off and on. That's not correct, Your Honor. Take, for example, the 131 patent. If you look at claim one of the 131 patent, this patent claims a controller that can modify the application of charge transfer based on the communications received as part of the demand response system. That's a controller that has the capability of reversing the flow of power to the grid. That is not a generic component. So you have a twofold inventive concept in the 131 patent and the 967 as well. You're adding the ability, the capacity to carry out utilities demand response commands via communication from a remote server. And secondly, and this doesn't have anything to do with communication at all... But how does it do that? I'm sorry? How does it do that? It does it just by turning the controller off and on. No, you may be thinking about what the district court said about the 715 patent. Well, I think, to me, this permeates almost all of these, all of the claims we're looking at. I encourage the court to look very carefully at the distinctions between the claims and the different patents. And the 131 patent actually has the capacity to reverse the flow of power, not only to turn the station on and off, but to adjust the level of power and to reverse the flow of power. There is absolutely no evidence in this record that that was conventional or even existed in the prior art. If you look at what the district court pointed to in the specification on this point... So are you making a step two argument with respect to claim 131? Well, at step two, there is an inventive concept added in claim one, and it's a non-generic component. And you see it also in claim eight of the 131. Well, I am getting into the district court's error at that point. If you'd like, I can turn back to step one. Well, I just heard you mention the fact that there's no evidence that it was conventional routine. That's a step two inquiry. You're absolutely right. And if you look at what the district court said on that point, and this is at page 63 of the appendix, the district court said that the specification stated that the combination of connecting generic networking equipment to a charging device to carry out a demand response plan already existed and was well understood routine and conventional. I'm sorry. I'm looking at appendix 63. That's the page 63 of the district court's opinion. The specification stated... This is his reading of the specification. So that's a demonstrably and facially false reading of the specification. The specification talks about cars, some cars having the ability, the technological ability to reverse the flow of power. There's nothing in the specification. You look at pages A152 or appendix 152 and appendix 154 about electric vehicle charging stations having that capacity. What it says is this, vehicle-to-grid is not widely available. There is a need for more widely available demand response and vehicle-to-grid to assist with peak load leveling. For demand response to be implemented effectively, real-time communication of a need for power input into the local electricity grid is required. And elsewhere at page 154, the specification says, it's column 6, electric vehicles that have the necessary vehicle-to-grid electronics are able to provide power to the local power grid. So the most you have in this specification is an acknowledgement that some cars had this capacity, not the charging stations did, and certainly not that it was well understood routine and conventional. So we think that that alone provides a basis under step 2 to reverse on that basis. But let me come back to the non-infringement defenses because I think they're very revealing at step 1. If you look at page 957 and 958, for example. Page 958, Semiconnect says, the accused products do not include a bridge between a local area network and wide area network, and therefore lack a data control unit as required by all 970, 131, and 715 patents. 957, the accused charging station neither receives communication that is, quote, part of a demand response system, nor does it locally, quote, modify application of charge transfer as required by all asserted claims of the 131 and 967 patents. The accused products do not practice the following limitations. And this is on 958. It lists two transceiver limits. Can you just explain to me again, because I think I asked about this the first time you referenced this and Judge Toronto followed up. What is the relevance? You're telling us what they said. We can read that. What is the relevance, in your view, of the fact that they said this? Where does that get you? The relevance is, and you can ask Mr. Whitehurst this. If these patents preempted the field in this area, if they claimed the generic and abstract concepts of networking in this particular technological context, then there could be no factual dispute. So it's on the preemption argument. It's on step one, but it's revealing because if you look at the granularity, the nitty-gritty factual aspect of these arguments, these are specific disputes about specific concrete limitations. Now, obviously, our position on these same issues is set forth in the complaint, pages 91 to 108. We have a different take. But these arguments would not be possible if the patent simply said, we claim the abstract idea of communicating over a network in the context of... Well, no claim has ever said that, we assume. But I take your... Okay, so it's mostly a preemption argument, but otherwise an argument to prove that we're dealing with concrete and tangible things here? I'm just trying to understand. It goes to both. If you look at the type of components we're talking about, a local area network, a wide area network, a data control unit, those are very specific, concrete, tangible components. And they're saying, look, we do things in a little different way. These are arguments about means, not about... They're not saying this is functional claiming. They're drilling right down and saying, we don't configure our system the same way, therefore we don't infringe. And that speaks volumes to whether an abstract idea is being claimed in the first place. Now, I'm... Same into my... Okay, why don't we hear from the other side? Thank you. Same over here for that. Okay. Good afternoon. Alan Whitehurst for the Apelli Semiconnect. And may it please the court, I'd like to start by going back to the patents themselves to show why these claims were psyched, generic, off-the-shelf components that are being used in an expected manner. When you look at the patents themselves, all four of the patents have the same background of the invention. These patents were attached to the complaint. They were part of the pleadings. These patents contained admissions that the district court was entitled to rely upon in When you look at the claims in light of the admissions and the specifications themselves, you see that the claims are merely taking a conventional charging station, using off-the-shelf devices to then remotely control it. If you turn, for example, to the Appendix 136, this is the background of the invention from the 715 patent. But this background of the invention is the same for all four asserted patents. If you look here in Column 2 of the 715 patent, you'll see a discussion that transceivers were known. And when we look at the claims, we see that the transceivers are being used in an expected way to transmit and receive. And the same is true for the control device and the controller. If you turn and look at Figures 1 and 3 of these patents, which appear, for example, on Pages 130 and 132 of the Joint Appendix, you'll see how simple the purported invention is. When we talk about the control device, we're talking about something that's so basic as to just turn electricity. So your opponent says that the pens improve the charging stations. Well, I think my colleague is confusing 102 and 103, because as this court recognized in Intellectual Ventures v. Symantec, whether there's an improvement or not is not the test for 101. But when we look at the claims in light of the admissions of the specification, we keep coming back to the reality that all of this was admitted, known, conventional technology. And to the extent there was an improvement at all, it had to be this remotely controlling. In fact, that's what ChargePoint admitted at the 12B6 hearing. When you look at Page 808 of the Joint Appendix, and you also see this on Page 800, you'll see that ChargePoint admitted that to the extent there was an improvement at all, it was this aspect of remotely controlling it. And when we look at this court's previous decisions in cases like credit acceptance, smart systems, electric power grid, vehicle intelligence, all of these cases have said time and time again that remotely controlling something over a network, that's an abstract idea. And when we look at more recent Federal Circuit's decisions, such as BSG Tech, we know that once you identify the abstract idea, once you turn to Alice Step 2, looking for the inventive concept, that abstract idea itself can't become the inventive concept under Alice Step 2. And that's the problem that ChargePoint faces here. When you look at the claims in light of the admissions and the specification, which the District Court was permitted to do, that's what we've seen in 12B6 decisions like TLI communications. When you rely on the admissions and the specification and put everything in the context that the transceiver was known, it was used in an expected manner, the control device, the controller were just things that could control the transceiver and the control device. Even the demand response, which we've heard a lot of from ChargePoint, when you look at column one of the background of the invention for all four of the asserted patents, we see that demand response is just this old basic concept of reducing power consumption during periods of peak usage. What about the reversal of the direction of the flow of electricity? That too, which is referred to in the background of the invention. Where exactly is that in the background? V2G. If we turn, for example, to page 136 of the joint appendix, when you see down at the bottom of the page, you'll see the discussion here of vehicle to grid. Bottom of column one? Correct, Your Honor. I believe it starts in the paragraph around line 57. We see at line 61 the discussion of V2G. You even see a statement here that V2G is particularly attractive for electric vehicles. It's admitted right here in the background of the invention that demand response, vehicle to grid, load leveling. If I remember right, Mr. Johnson stressed the difference between vehicle to the grid and charging station to the grid. You see here that in the patent itself, it's talking about demand response and vehicle to grid being used in pilot programs. If you look there in line 66 and 67, it says V2G is not widely available. It's principally being used in small pilot schemes. There's a need for more widely available demand response in V2G to assist with peak load leveling. I think it speaks for itself that when you say more widely available, it recognizes that it was already available, that it was being used in these pilot schemes. Here, you have a discussion in the background of the invention acknowledging that demand response is this old basic concept. You have this discussion that load leveling has already been used in the industry and that there's a desire to make it more widely available. Here, we see in the background of the invention that not only are the transceiver, the control device, and the controller all known generic off-the-shelf devices, but these concepts of demand response and load leveling were also known in the industry. When you take these concepts that you see in the background of the invention, these admissions and the patents themselves, and combine them with the statements that ChargePoint made itself at the 12B6 hearing on pages 808 and 800, you come to the realization that there's no genuine factual dispute. You have here claims that are reciting known generic off-the-shelf devices and concepts that are being used in an expected way. When you look for what else could possibly be the improvement, the only improvement that ChargePoint has pointed to is this concept of remotely controlling, as counsel said on page 808. This court has recognized that it can be particularly useful to look for claims in other cases that have been held to be abstract. My colleague mentioned the smart systems. I think the smart systems is incredibly informative for the claims that are before the court today. The claims here are remarkably similar to the claims that were in smart systems. When you look at the claims in smart systems, you see that a processor that was remote to the subway station was checking a bank card in order to control a turnstile in a subway station. This processor was controlling access to the subway. The decision in smart systems commented that the claims were not reciting an improvement to the bank card. They were not reciting an improvement to the turnstile, and they were not reciting an improvement to the database. Because of that, those claims did not satisfy 101. We see the same thing here. When you look at each of the components, either individually or taken as an ordered combination, all of them were known, and they're all being used in an expected manner. Do you have a view about whether... I guess we got a couple of supplemental submissions about last week's PTO proposed guidance. I realize they're proposed and they're not binding. Do you have a view about whether your position in this case would fall within the substance of what is stated in that guidance? We don't have a position on that, but I think the more important point is that they're not binding on the federal courts. These are proposed guidance for patent examiners. They're not even final. They're open for comment. But even at the district court level, ChargePoint itself said that proposed guidance for patent examiners is not binding on the district courts. You haven't thought through whether you can say, oh, here's why we would qualify. That's qualify in the sense of... Right. I believe one of them was collecting data, although at the district court level, I believe it was framed as remotely controlling. But when you're remotely controlling, I think that in that situation, the server that's at play in these claims would still be collecting information. As part of that decision to remotely control, whether to turn on or off the power, whether to turn it up or down, would be collecting information over the internet. It would be checking to see whether this was... Does this admitted prior art discussion at bottom column one, column two, about vehicle to grid, specifically say that even in a pilot form that is available at the charging station, that the charging station is set up to reverse the flow? That is my understanding because in order for there to be vehicle to grid, there would have to be a vehicle at a charging station that when the vehicle is plugged into... So this isn't referring to vehicle to grid locations that are not also chargers? No, Your Honor. In order for... Maybe there even couldn't be anything like that. It's just a wire to the generator. I think it's a good question, and I struggle to think of any possible reading. When I read this, the only logical conclusion you can come to is that when you talk about vehicle to grid, you have to be plugging the vehicle back into the grid. Well, how is the vehicle plugged back into grid? Presumably it's at a charging station. So once the vehicle is plugged back into the charging station, which is then connected back to the grid as we would see in figures one and three of the patent, that's how the electricity would flow from the electric vehicle back to the grid, which is what the name states, vehicle to grid. And it would be done through a charging station. On the preemption point, we all know that preemption is a guide. It's not dispositive. When we look at the situation that's before the court, this is a problem of ChargePoint's own doing. When we look at the pleadings, when we look at the complaint, we see that ChargePoint asserted these patents, made representations to the court that they should be given the plain and ordinary meaning, the full scope of it, and in the complaint, they made representations that these claims would read on any network charging stations. The district court was entitled to rely upon those claim constructions. As we've seen in this court's decisions, the district court did as it's been instructed to do, to rely on the non-movements claim constructions, and that's what the court did at the district court level. I see that I still have time left. There's no requirement that you use it. And I will gladly yield the remainder of my time unless the panel has any further questions for me. Thank you. Thank you. Can I ask you about something, Mr. Johnson? At 808, the transcript of the colloquy between you and the court, I take it that you refer first to not charge the vehicle during periods of high power grid load and to sell power back to the local grid, and then it's in the question and answer right after that that you seem to say the only thing that we think is novel here is the remote control. Well, Your Honor, I think the district court's opinion ultimately reflects you have to look at the claim language and you have to look at each claim. The question as it was framed to counsel below was something like, are you claiming in the sense of are you arguing this? And counsel responded by speaking generally about the problem that the patenteers seek to solve. And I'd like to walk the court through the specific things that are inventive and non-conventional in each of the claims. But first I want to respond to the point about vehicle to grid, because you heard Mr. Whitehurst say that the specification speaks for itself, and he said presumably the only way you do vehicle to grid is if you go through a charging station. You will not find anything to that effect in the specification. It is not true, and it's certainly not supported by this record. And so I think that passage in the specification speaks for itself as well. And as the challenger to these patents, which are presumed valid, you have to presume unless there's something in the record that says this is conventional, that it's not. So I want to address that point first. But speaking now specifically to the claim language and what it is that's inventive and not conventional, I'll start with the 131, Claim 1. A controller that reverses the flow of power to the grid is not generic. A controller that can manage charge transfer to electric vehicles is not generic. That's Claim 8 of the 131. Under the 967 patent, sending communications to electric vehicle charging stations to modify the flow of power to an electric vehicle, that's not generic. Under the 715 patent, calls for an electrical coupler to make a connection with an electric vehicle. That's not generic. The 570 patent calls for a current measuring device and a controller configured to operate the control device and to monitor the output. That's non-generic. You can't adjust or reverse the power level if you can't measure it. So there's no evidence that these elements existed in the prior art. They're put together in a new configuration in the claims in this case, and that's why it's not abstract, and that's why it's a valid claim. Now turning to the cases, I spoke a bit about smart systems in my opening argument. I didn't hear any response to the passages where this court's opinion says there's no claim to improved computer technology or to improvement in the technology itself. As to the Alstom case, the electric power group versus Alstom case, the court there said the focus of the claims is not on an improvement in computers as tools but on certain independently abstract ideas that use computers as tools. That's at page 1354. You see a consistent line in this court's cases between claims to the use of generic devices for abstract ends and claims to improvements in the devices themselves. This case involves the latter. Next, he referred to remotely controlling something as being an abstract idea, and we respectfully would dispute that. You can't, unless you're a Jedi, remotely control something with your mind. It's not a mathematical equation. It's not a fundamental economic practice. It's something that requires structural items configured to accomplish that end. What about cases of ours, I think exist, that talk about controlling access to computer resources? Well, I don't think that's... Through all kinds of get information, decrypt this, whatever. Typically, even the cases that he's citing involve the abstract idea of collecting data from multiple sources and analyzing it, using computers for things like that. None of the cases actually say that remote control is an abstract idea. I urge you to look at them carefully. None of them hold that. So I'm not 100% sure I'm tracking your question. Well, I guess what I think I'm hearing you say is that since what's going on here is remote control of, just to simplify, an on-off switch, and maybe even a reversal switch, a reversal of direction switch, that that's not abstract. And I'm trying to think, well, maybe we haven't had that precise thing before, but what about other ideas, simply because of their familiarity and generality, are abstract, like sets of steps for granting access? By granting, I mean something actual physical, right? A person at the gate saying, please come in. It's something physical in the computer that's saying, now you may have access to the following memory in this server. If that can be abstract, why can't this be? Well, I think you have to look at each particular type of function on its own to determine whether it's really abstract. I mean, to me, the idea of remote control is not abstract because it doesn't fall into the categories that this court and the Supreme Court have said are abstract. Analyzing data is something you do in your mind. I suppose potentially allowing access is that type of thing. Well, to the extent that you're looking at fundamental economic practices, if that's a category of what's abstract, as this court has said, then over time... Just controlling access to a computer resource with a bunch of steps, the last one of which is a key unlocks a door, a computer door. Well, if it's framed at that level of generality, that may be true, but where you are saying, we're claiming the key or we're claiming a device that enables opening of, say, a physical door. Right, but I guess what I understood the district court basically to say here is in part based on the colloquy around 808, but the extensive colloquies and what's in the, I guess, admitted prior art, that everything about the mechanism for turning on, off, or reversing the flow in the charging device was off-the-shelf stuff. It may not be the only off-the-shelf stuff. You might be able to do it differently, but people have been remotely turning on and off the heat in their home for a long time. There's nothing in this record to suggest that adjusting the level of power of a charging station or reversing the flow of power was off-the-shelf. The specification shows the opposite, and to the extent you care to look beyond and look at the Haas and Baxter declarations, they show the opposite as well. Let me close by saying I think the district court, effectively by focusing on concepts like abstract ideas, sending requests, and receiving command, effectively wrote the structural limitations out of the claim. We think that that stretches ALICE beyond the breaking point. I've yet to see any case that claims an apparatus, a device, configured in a specific way with at least some new non-conventional components struck down by this court or the Supreme Court under 101. We urge the court to reverse. Thank you.